UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| WILLIAM H. WHITFIELD,<br><br>   Plaintiff,<br><br>v.<br><br>TRADE SHOW SERVICES, LTD., a Nevada corporation, dba PRO-TECT SECURITY; LESLIE BRUNO; and STEVE SUMMIT,<br><br>   Defendants. | 2:10-CV-00905-LRH-VCF<br><br>ORDER |

  Before the court is Defendants' Motion for Summary Judgment (#13[1]). Plaintiff filed an opposition (#17), and Defendants replied (#20).

**I. Facts and Procedural History**

  This is an employment discrimination action involving allegations that Plaintiff William Whitfield, who is African-American, was terminated on Election Day, November 4, 2008, by Defendant Trade Show Services, Ltd., d.b.a. Pro-Tect Security ("Pro-Tect"), for declaring his support and voting for an African-American presidential candidate, Barack Obama. Also named as defendants are Leslie Bruno, Pro-Tect's owner and president, and Steve Sammut, Pro-Tect's senior account manager (incorrectly named in the complaint as "Steve Summit").

---

[1]Refers to the court's docket entry number.

1        Pro-Tect provides security to trade shows and conventions. Whitfield was hired as an
2 account manager in September 2008 after being interviewed by Bruno and Sammut. The first 90
3 days of Whitfield's employment was a probationary period, during which his skills, abilities and
4 overall fit for his position would be assessed and he was subject to termination at any time, with or
5 without notice. Whitfield's scheduled work hours were 8 a.m. to 4 p.m., Monday through Friday;
6 however, his actual hours and job location varied depending on client needs. On Election Day,
7 Tuesday, November 4, 2008, Pro-Tect was scheduled to provide security for a client at the Las
8 Vegas Convention Center.
9        The day before Election Day, Whitfield notified Bruno and Sammut that he intended to vote
10 first thing Tuesday morning. Initially, Sammut remarked that Whitfield should vote on
11 Wednesday, November 5. Whitfield took great offense to Sammut's remark because of his
12 awareness that telling African-Americans they were supposed to vote the day after Election Day
13 was a voter suppression tactic used against black voters in the Jim Crow South. Sammut maintains
14 he was unaware of such practices. In any event, it is undisputed that Sammut backed off his remark
15 and told Whitfield he had to report to work on Tuesday at 7 a.m., as managers were ordinarily
16 expected to arrive early for conventions. Whitfield told Sammut that he would be unable to arrive
17 precisely at 7 a.m. because he had to drop off his daughter at school. Sammut responded, "Okay,
18 just get in when you can." Bruno then told Whitfield that she would give him time off to vote early
19 that day if he was "voting for the right person." Bruno said she was against the candidate who was
20 intending to "raise taxes on the rich," implying she was against Barack Obama. She added, "I own
21 the company so I have to look out for mine." Sammut asked Whitfield if he intended to vote for
22 Barack Obama, and Whitfield said "yes." Sammut then told Whitfield that he could leave at
23 lunchtime on Tuesday in order to vote, and Whitfield agreed.
24        On Election Day, Whitfield arrived for work at 7:30 a.m. He left the convention center to
25 vote sometime between noon and 1 p.m. Before leaving the building, he sent a text message to
26
                                           2

Sammut to notify Sammut and Bruno that he was leaving to vote. Sammut responded, "OK." According to Whitfield, although his polling station was only about 9 miles from the Las Vegas Convention Center, it took him nearly an hour to get there because of the distance he had to walk to his car and traffic. He then confronted long lines at the polls and did not finish voting until about 4:30 p.m. By that time, Whitfield considered his shift to be over because it ordinarily ended at 4 p.m. Nonetheless, he texted Sammut to ask whether he was needed back at work. Sammut responded, "U better make an appearance at least." Whitfield then drove back to the Pro-Tect office at the convention center, which took 20 to 30 minutes because of rush-hour traffic.

Whitfield was promptly terminated upon his return. He met Bruno and Sammut outside the Pro-Tect office at the convention center and was told by Sammut that he didn't feel the job was "a good fit" for Whitfield. Whitfield asked, "Because I went to vote?" And Sammut responded, "Well, we needed everybody here."

On June 11, 2010, Whitfield filed this wrongful termination action under state and federal law. In his First Amended Complaint (#5), Whitfield asserts five claims: (1) racial discrimination under Title VII; (2) racial discrimination under NRS § 613.330; (3) tortious discharge in violation of state public policy, as expressed in NRS §§ 293.463 and 613.040; (4) racial discrimination under 42 U.S.C. § 1981(a); and (5) conspiracy under 42 U.S.C. § 1985(3).

## II.     Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *Id.* at 252.

**III.  Discussion**

    **A.  Racial Discrimination under Title VII, NRS § 613.330, and § 1981**

Title VII makes it unlawful for an employer to discharge or otherwise discriminate against an individual in the terms and conditions of employment "because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Nevada law is in accord. *See* NRS § 613.330(1)(a) ("because of his or her race"). Likewise, § 1981 prohibits racial discrimination in the making and enforcement of contracts, including employment, by public and private actors. *See* 42 U.S.C. § 1981(a) & (c); *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987); *see also Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 373 (2004) (hostile work environment, wrongful discharge, and refusal to transfer claims are cognizable under § 1981). Given this overlapping coverage, the parties agree

4

that Whitfield's racial discrimination claims under each of these provisions, although separately enumerated in the complaint, may be analyzed together.

Whitfield does not claim that he was terminated because he is an African-American; indeed, he admits this is not the case. Instead, Whitfield claims that he was terminated because he declared his support and voted for an African-American presidential candidate. In other words, Whitfield's claim is one of associational discrimination—that Defendants intentionally discriminated against him because of race based on his association with an African-American through the act of voting. He relies on several cases finding that associational discrimination claims are viable under Title VII. *See Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, and GMAC Trucks, Inc.*, 173 F.3d 988, 993-95 (6th Cir. 1999) (allegation that a white employee was discharged because his child was biracial stated a claim); *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) (allegation that a white employee was terminated because of an interracial marriage stated a claim); *Rosenblatt v. Bivonas & Cohen, P.C.*, 946 F. Supp. 298, 299-300 (S.D.N.Y. 1996) (same); *Holiday v. Belle's Restaurant, Inc.*, 409 F. Supp. 904, 908-09 (W.D. Pa. 1976) (same).

As reflected in each of these opinions, however, the interracial nature of the association was central to the courts' analysis. They reasoned that discrimination based on an employee's interracial association necessarily entails discrimination on account of the employee's own race, thereby satisfying Title VII's "because of race" requirement, "even though the root animus for the discrimination is a prejudice against the biracial child" or the black spouse. *Tetro*, 173 F.3d at 994 (following *Parr*); *accord Parr*, 791 F.2d at 892 (adopting the logic of *Whitney v. Greater New York Corp. of Seventh Day Adventists*, 401 F. Supp. 1363, 1366 (S.D.N.Y. 1975)); *Rosenblatt*, 946 F. Supp. at 299-300 (following *Whitney* and *Parr*); *Holiday*, 409 F. Supp. at 908-09.

Here, Whitfield alleges no such interracial association or animus toward interracial associations. Although Barack Obama is in fact biracial, Whitfield regards him as a fellow African-American and specifically claims that Defendants terminated him "for being an African-American who expressed the intention to vote for an African-American presidential candidate."

5

First Amended Complaint (#5), ¶ 28. Thus, the logic of the above-cited cases—that discrimination because of an interracial association necessarily entails discrimination based on the plaintiff's race, even though the prejudice is against the associate's differing race or against the interracial association itself—is inapplicable here.

Moreover, even if Whitfield's same-race associational discrimination theory were tenable, it fails on the evidence presented. Even assuming that Whitfield could establish he was terminated because of his support for Barack Obama, he has produced no evidence to establish that the root animus for his termination was prejudice against Obama as an African-American. The only evidence presented of Defendants' reasons for opposing Obama's candidacy is Bruno's opposition to Obama's policy positions related to taxes. There is no evidence suggesting that Defendants' opposition was on account of race. Whitfield contends that Sammut's remark that he could vote on Wednesday was an allusion to a voter suppression tactic used against black voters in the Jim Crow South. But even assuming Sammut's comment can be so construed, any discriminatory animus implied therein was directed at Whitfield as a black voter, rather than at Obama as a black candidate, and Whitfield has specifically disclaimed any allegation of direct racial discrimination against himself.

For these reasons, the court concludes that Whitfield has failed to establish a genuine issue of material fact to support his claim of associational discrimination on account of race under Title VII, NRS § 613.330, and § 1981. Defendants are therefore entitled to summary adjudication on Whitfield's first, second, and fourth claims for relief.

**B. Conspiracy under Section 1985**

Whitfield's fifth claim for relief is brought under 42 U.S.C. § 1985(3). He alleges that Bruno and Sammut[2] conspired to deprive him of equal protection and equal privileges and

---

[2] Although the complaint is ambiguous as to whether Whitfield's § 1985 claim is also alleged against Pro-Tect, his briefing reflects that the claim is alleged against Bruno and Sammut only. *See* Opposition (#17), pp. 21-23. The court construes the claim accordingly.

6

1  immunities under the law, and to prevent him from lawfully voting for the presidential candidate of
2  his choice.  Section 1985(3) authorizes a private right of action "[i]f two or more persons . . .
3  conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of
4  persons of the equal protection of the laws, or of equal privileges and immunities under the laws."
5  *Id.*  It also authorizes a private right of action "if two or more persons conspire to prevent by force,
6  intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or
7  advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an
8  elector for President or Vice President, . . . ; or to injure any citizen in person or property on
9  account of such support or advocacy[.]"  *Id.*  Unlike § 1983, which requires action under color of
10 state law, § 1985(3) can apply to purely private conspiracies without any requirement of state
11 action.  *Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971).

12         Defendants contend that Whitfield's claim fails under the intra-corporate conspiracy
13 doctrine, which provides that, as a matter of law, a corporation and its agents cannot conspire
14 amongst themselves because they are one entity under the law and the acts of the agent are the acts
15 of the corporation.  *See Hoefer v. Flour Daniel, Inc.*, 92 F. Supp. 2d 1055, 1057 (C.D. Cal. 2000).
16 As Defendants point out, although the Ninth Circuit has not addressed the issue, a majority of
17 circuits have held the doctrine applies to § 1985 claims.  *See id.* at 1057-58 (identifying the Second,
18 Fourth, Sixth, Seventh and Eighth Circuits as extending the doctrine to § 1985 claims, and the First
19 and Third as refusing to do so).  In response, Whitfield contends that the doctrine is inapplicable
20 "where individually named defendants act outside the scope of their employment or for personal
21 reasons," *Boone v. Federal Express Corp.*, 59 F.3d 84, 87 (8th Cir. 1995) (citing *Cross v. General
22 Motors*, 721 F.2d 1152, 1156 (8th Cir. 1983)), or when two or more corporate officers or managers,
23 by agreement, commit separate, distinct discriminatory acts, citing *An-Ti Chai v. Michigan Tech.
24 Univ.*, 493 F. Supp. 1137, 1167 (W.D. Mich. 1980).

25         Here, the facts presented do not fit the exceptions on which Whitfield relies.  First, to the
26 extent Whitfield's § 1985(3) claim is one for conspiracy to deny him equal protection or privileges

7

and immunities, Whitfield has failed to produce sufficient evidence that his termination was on account of race, as discussed above. Second, to the extent Whitfield's claim is one for conspiracy to prevent him from voting or to retaliate against him for voting,[3] he has failed to establish that Defendants committed separate, distinct discriminatory acts or acted outside the scope of employment. Whitfield has provided evidence of only one act by Bruno and Sammut in furtherance of the alleged conspiracy—Whitfield's termination—which was committed jointly and could be accomplished only in their capacities as officers and managers of the corporation.

On these undisputed facts, the court finds that the exceptions to the intra-corporate conspiracy doctrine cited by Whitfield are inapplicable and that the doctrine applies. *See Cross*, 721 F.2d at 1156-57 (recognizing the exceptions but finding them inapplicable where "the agents' acts arguably were within the scope of employment"); *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir. 1972) ("[I]f the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by [§ 1985(3)]."). Defendants are therefore entitled to summary adjudication on Whitfield's § 1985(3) claim.

### C. State Law Wrongful Termination

In Whitfield's remaining claim—his third—he alleges that he was wrongfully terminated for his stated voting preferences, "in violation of strong and compelling Nevada public policy, as expressed in NRS 293.463 and NRS 613.040, among other places." First Amended Complaint

---

[3]The parties appear to treat Whitfield's vote suppression and retaliation allegations as part and parcel of his equal protection and privileges and immunities allegations, so that Whitfield could prevail under § 1985(3) only if he could prove some racial or class-based invidiously discriminatory animus. The court doubts this is the case. "The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102. However, § 1985(3)'s prohibitions on voter suppression and retaliation are separately enumerated and distinguished in the statutory text by the disjunctive "or," suggesting that such claims stand apart from and do not share the same essential elements as an equal protection or privileges and immunities claim. In any event, Whitfield is unable to establish an actionable conspiracy under any theory.

(#5), ¶ 40. Section 293.463 grants employees a limited right to be absent from work "at a time to be designated by the employer for a sufficient time to vote," defined based on the distance between the voter's place of employment and polling place, and prohibits the imposition of any discipline or penalty for a qualifying absence. Section 613.040 prohibits employers from "preventing any employee from engaging in politics or becoming a candidate for any public office in this state." Whitfield further alleges that "NRS 613.070 creates a private right of action for violations of NRS 613.040." No similar allegation is made regarding NRS 293.463. Accordingly, the court construes Whitfield's third claim for relief as alleging both (1) a common law claim for public policy tortious discharge in violation of Nevada public policy protecting an employee's right to vote for the candidate of his choice and to be absent from work to vote, and (2) a statutory claim for violating Whitfield's right under NRS 613.040 to engage in politics through voting.

Nevada recognizes a common law cause of action for tortious discharge in violation of public policy as an exception to the at-will employment doctrine. *Wayment v. Holmes*, 912 P.2d 816, 818 (Nev. 1996). However, "public policy tortious discharge actions are severely limited to those rare and exceptional cases where the employer's conduct violates strong and compelling public policy." *Sands Regent v. Valgardson*, 777 P.2d 898, 900 (Nev. 1989). "To support a claim of tortious discharge, the evidence produced by the employee must be concrete and establish outrageous conduct that violates public policy." *State v. Eighth Jud. Dist. Ct. (Anzalone)*, 42 P.3d 233, 240 (Nev. 2002). Qualifying public policy violations include discharging an employee for filing a workmen's compensation claim, *Hansen v. Harrah's*, 675 P.2d 394, 397 (Nev. 1984); for refusing to work under unreasonably dangerous conditions, *D'Angelo v. Gardner*, 819 P.2d 206, 216 (Nev. 1991); and for reporting or refusing to participate in illegal activity, *Allum v. Valley Bank of Nev.*, 970 P.2d 1062, 1069 (Nev. 1998). By contrast, Nevada has declined to recognize a common law cause of action for tortious discharge in age discrimination cases due to the availability of statutory remedies, *Sands*, 777 P.2d at 899-900; where an assistant district attorney was terminated for conduct that exceeded his ethical obligations and constituted insubordination,

9

*Wayment*, 912 P.2d at 818-19; and in "mixed motives" cases where the employee's protected conduct is not "*the* proximate cause of his discharge," *Allum*, 970 P.2d at 1066.

Nevada courts have yet to confront the question of whether terminating a worker for his stated voting preference, or for voting for a particular candidate for national office, constitutes a qualifying public policy violation and warrants an exception to the at-will employment doctrine. Nor is the court aware of any decisions by Nevada courts applying NRS 613.040 in such a case. Given Nevada's interest in deciding novel questions of state law and this court's above rulings granting summary adjudication to Defendants on all of Whitfield's federal claims, the court finds it appropriate to decline to exercise supplemental jurisdiction over Whitfield's remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3) so that such claims may be pursued in state court.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (#13) is GRANTED as to Plaintiff's first, second, fourth and fifth claims for relief.

IT IS FURTHER ORDERED that Plaintiff's third claim for relief is DISMISSED without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

The Clerk of Court shall enter judgment accordingly.

IT IS SO ORDERED.

DATED this 1st day of March, 2012.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE